**Susan MARDINI, Plaintiff,**

v.

**VIKING FREIGHT, INC., a California Corporation, registered to do business in the State of New Jersey; and Thomas Borg, individually, Defendants.**

**No. Civ.A. 99–3488 JWB.**

United States District Court,
D. New Jersey.

Dec. 2, 1999.

Anthony N. Verni, West Orange, NJ, for plaintiff.

DeCotiis, Fitzpatrick & Gluck, by Susan Volkert, Teaneck, NJ, for defendant Viking Freight, Inc.

## OPINION

BISSELL, District Judge.

Plaintiff, Susan Mardini, filed the Complaint in this matter in the Superior Court of New Jersey on May 27, 1999 against defendant Viking Freight, Inc. ("Viking") and Thomas Borg.[1] Viking removed the matter to this Court on July 23, 1999, based upon diversity jurisdiction. The motion before this Court is a motion to dismiss six of the seven counts alleged in the Complaint. Plaintiff has alleged a violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5–1 *et seq.* ("LAD"). Defendant's motion to dismiss does not include the plaintiff's LAD claim.

---

1. Thomas Borg is not a party to this motion. He was never served with a Complaint in this action and is not represented by attorneys for Viking Freight.

The six claims at issue here include a breach of an employment contract, a breach of the implied covenant of good faith and fair dealing contained within the employment contract, a common law wrongful discharge claim, intentional infliction of emotional distress, fraud, and negligent supervision of employees. This Court has jurisdiction pursuant to 28 U.S.C. § 1332.

### FACTS

Ms. Mardini was hired by Viking on November 12, 1992 to handle the accounts of Viking's recent acquisitions, regional trucking carriers Coles Express, Inc. ("Coles") and Spartan Express, Inc. ("Spartan"). (Compl. at 2). Plaintiff was discharged on February 10, 1999. (*Id.* at 13).

Plaintiff claims that Viking instituted and enacted policies and practices of unlawful and systematic exclusion of and discrimination of the plaintiff. (*Id.* at 4). Plaintiff claims that Viking: (a) hired plaintiff at a lower rank and pay than male employees; (b) failed to give plaintiff comparable raises; (c) failed to promote plaintiff at the same rate as comparably qualified males; (d) paid plaintiff lower wages than comparable male employees; (e) failed to equalize conditions of employment for plaintiff, with respect to the quality and quantity of accounts; (f) provided plaintiff with either poor performing accounts or accounts which had terminated their relationship with Viking, while allowing Ms. Mardini's male counterparts access to the prime accounts; (g) took accounts from Ms. Mardini to accommodate male employees, but did not do the same for the plaintiff; (h) adopted unreasonable standards of employment and advancement designed to discriminate in favor of men; and (I) unlawfully terminated plaintiff in favor of retaining men who were comparably trained and less qualified with less tenure than the plaintiff. (*Id.* at 4, 5).

In the first count of plaintiff's Complaint, she alleges a cause of action for discrimination. She states that male co-workers were given accounts located in plaintiff's territory which were more convenient to her than to them. (*Id.* at 6). Plaintiff was given the "left over" accounts and the less desirable accounts to work with, and the preferred accounts were given to male employees. However, plaintiff was successful in her work even though she had to work with the "left over" accounts. (*Id.*) She was also subject to disparate treatment when Jude Reardon, a male co-worker, was given fifty per cent of plaintiff's accounts. (*Id.*) Reardon was considered a poor producer and was slated for termination. (*Id.* at 7). Instead of terminating him, management hired him as a Corporate Accounts Director and he was given half of plaintiff's accounts. (*Id.*) None of the male Corporate Account Directors suffered any diminution in their account base as plaintiff did. (*Id.*)

In 1996, two employees left Viking. (*Id.* at 8). Their accounts were given to Reardon and another male employee and none were given to plaintiff. (*Id.*) Reardon still had one-half of plaintiff's accounts. (*Id.*) Plaintiff complained about this disparity but nothing was done to remedy it. (*Id.*)

Plaintiff requested that her supervisor, Mr. Borg, review the accounts and redistribute them to bring about parity. (*Id.* at 9). Instead, another employee was let go and his accounts were given to Reardon as well. (*Id.*) As a result of these actions, Reardon, who had less seniority than plaintiff, was generating sales three times those of plaintiff. (*Id.*) Plaintiff again requested a redistribution but Borg did not react. (*Id.* at 10). In February 1998, plaintiff formalized her request for equalization of the accounts in a memo to Borg. (*Id.*) In June 1998, this topic was discussed at a territory review meeting in Chicago with Borg and Mike Marcum. Plaintiff wrote a memo to Marcum and Marcum indicated that Borg would review the situation. Borg never responded. (*Id.*)

Plaintiff continued to work hard and increased her revenues substantially by October 1998. However, her review for that year gave her a lower increase in pay than

the year before. (*Id.* at 11). Plaintiff again raised the issue of the accounts at a territory meeting in Chicago on or about December 12, 1998, and prepared a detailed memo for discussion purposes. (*Id.*) In January 1999, plaintiff was told that she would be given back all of her accounts that had gone to Reardon, with the exception of Barnes and Noble. (*Id.*) Reardon retained these accounts and they were never transferred back to the plaintiff. (*Id.* at 12). Plaintiff repeatedly questioned Borg about the accounts, but she was met with indifference, so she contacted Marcum. (*Id.*) Marcum stated that it was a judgment call by Borg and that Borg was upset over being confronted at the December 12 territory meeting in Chicago. (*Id.*) Plaintiff was then terminated on February 10, 1999 based on an allegation that she had submitted a false expense report related to a dinner with a client. (*Id.* at 13).

Plaintiff's second cause of action alleges a breach of contract claim. In support of this claim plaintiff claims that defendants represented to plaintiff, "in various writings, including, but not limited to, personnel policies and procedure manuals, retirement and profit-sharing plan and employee guidelines, that her employment relationship with Viking, would be based upon good faith, that Plaintiff would be treated fairly and equitably, would be judged on the basis of individual merit and ability, and would receive just compensation for the services rendered to Viking." (*Id.* at 15). Plaintiff claims that she performed all of her duties in accordance with her employment contract, yet Viking wrongfully discharged her. (*Id.* at 15–16).

The employment handbook on which plaintiff relies stated that:

> The contents of this employee handbook are solely intended to provide guidance and understanding of the benefit plans and policies of Viking Freight System, Inc. These benefits and policies in no way constitute an employee contract. Details and specific information are available in the governing documents. Any questions can be referred to your Supervisor or the Personnel Department.

(Defendant's Exh. B at 70).

Plaintiff's third cause of action alleges a breach of an implied covenant of good faith and fair dealing. (Compl. at 17). This action is based on the employment agreement, which plaintiff claims created a covenant of good faith and fair dealing. The defendant breached this, plaintiff claims, by (a) discriminatorily refusing to judge plaintiff on the basis of merit; (b) refusing to give her equal opportunity for advancement; (c) failing and refusing to reconsider plaintiff's merit and ability for promotion or transfer; (d) failing to give any consideration to plaintiff's long-term record of employment service; (e) terminating plaintiff in favor of retaining less qualified and less experienced male workers. (*Id.* at 17–18).

The fourth cause of action is a wrongful discharge claim, stating that for the reasons already set forth, plaintiff is entitled to damages for wrongful discharge. (*Id.* at 19–20). Plaintiff's fifth cause of action is for intentional infliction of emotional distress. The sixth cause of action alleges fraud, deceit and misrepresentation. Plaintiff alleges that the defendants made material misrepresentations of the fact that plaintiff was to be judged upon the basis of merit and ability. (*Id.* at 22). Finally, the seventh cause of action alleges negligent supervision of employees. Plaintiff claims that the defendants owed a duty to plaintiff to insure that her supervisors treated plaintiff in a fair and equitable manner in order to equalize employment conditions and have plaintiff judged on her merit. (*Id.* at 24). These duties were delegated to Thomas Borg, who failed to equalize employment conditions. (*Id.*)

### ANALYSIS

#### I. Standard

Federal Rule of Civil Procedure 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law.

*Neitzke v. Williams,* 490 U.S. 319, 326, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) (*citing Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In disposing of a motion to dismiss, the court must operate on the assumption that the factual allegations in the complaint or counterclaim are true. *Neitzke,* 490 U.S. at 326–27, 109 S.Ct. 1827. A motion to dismiss may be granted if the opposing party would not be entitled to relief under any set of facts consistent with the allegations in the complaint or counterclaim. As the Supreme Court stated in *Neitzke:*

> [n]othing in Rule 12(b)(6) confines its sweep to claims of law which are obviously insupportable. On the contrary, if as a matter of law "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations," *Hishon, supra* at 73, 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59, a claim must be dismissed, without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one. What Rule 12(b)(6) does not countenance are dismissals based on a judge's disbelief of a complaint's factual allegations.

(*Id.* at 327, 109 S.Ct. 1827).

## II. Application

> A. *Plaintiff's Claims for Breach of Contract and for Breach of the Implied Covenant of Good Faith and Fair Dealing are Dismissed, Because No Employment Contract was Created.*

Plaintiff claims that a contract existed between Viking and herself and that the defendant breached that contract and also breached the implied covenant of good faith and fair dealing that the contract created. (Compl. at 15, 17). In support of these claims plaintiff argues that defendants represented to plaintiff, "in various writings, including, but not limited to, personnel policies and procedure manuals, retirement and profit-sharing plan and employee guidelines, that her employment relationship with Viking, would be based upon good faith, that Plaintiff would be treated fairly and equitably, would be judged on the basis of individual merit and ability, and would receive just compensation for the services rendered to Viking." (*Id.* at 15). The only documents included within the materials submitted to the Court are copies of the defendant's employee manuals. This Court will assume, therefore, that plaintiff's claims rely upon the manuals as creating a contractual relationship.

In *Woolley v. Hoffmann–La Roche, Inc.,* the Supreme Court of New Jersey found that the provisions of employee manuals could be contractually enforceable. 99 N.J. 284, 297, 491 A.2d 1257 (1985). The Court in *Woolley* found that, absent a clear and prominent disclaimer, an implied promise in a widely distributed employment manual that an employee would only be fired for cause was enforceable. (*Id.* at 297–98, 491 A.2d 1257). The basic test for determining whether a contract of employment can be implied turns on the reasonable expectations of the employees. A number of factors are relevant in deciding an employee's expectations, such as the definiteness and comprehensiveness of the termination policy and the context of the manual's preparation and distribution. *Witkowski v. Lipton,* 136 N.J. 385, 393, 643 A.2d 546 (1994).

The Court concluded that if an employer did not want the manual to be construed by the courts as a contract,

> All that need be done is the inclusion in a very prominent position of an appropriate statement that there is no promise of any kind by the employer contained in the manual; that regardless of what the manual says or provides, the employer promises nothing and remains free to change wages and all other working conditions without having to consult anyone and without anyone's agreement; and that the employer continues to have the absolute power to fire anyone with or without good cause.

*Woolley,* 99 N.J. at 309, 491 A.2d 1257. In *Nicosia v. Wakefern Food Corp.,* 136 N.J. 401, 643 A.2d 554 (1994), the New Jersey Supreme Court interpreted the requirement of a prominent disclaimer to mean that a disclaimer must be separated from or set off from the rest of the plan in a way to attract attention. 136 N.J. 401, 415–16, 643 A.2d 554. The Court in *Nicosia* concluded that the employer "had failed to meet the prominence test in part because its 'statement is not highlighted, underscored, capitalized, or presented in any other way to make it likely that it would come to the attention of an employee reviewing it.' " (*Id.*)

In the instant case there were two manuals distributed by Viking, one in 1992, and the other in 1997. (Defendant's Exhs. B and C). One manual was in effect when Ms. Mardini was hired, and the other was in effect when she was discharged. In the instant case, the Employment Manual for 1992 stated that:

> The contents of this employee handbook are solely intended to provide guidance and understanding of the benefit plans and policies of Viking Freight System, Inc. These benefits and policies in no way constitute an employee contract. Details and specific information are available in the governing documents. Any questions can be referred to your Supervisor or the Personnel Department.

(Defendant's Exh. B at 70).

In *Falco v. Community Medical Center,* the New Jersey Appellate Division found that a disclaimer did not meet the *Nicosia* standards of highlighting or bold type. 296 N.J.Super. 298, 318, 686 A.2d 1212

(1997). However, the court found that the disclaimer was effective nonetheless because of its prominent placement, by itself, on the first page of the handbook. (*Id.*)

▮ Although the language in the 1992 disclaimer is clear, the disclaimer is not sufficiently prominent to meet the requirements in *Nicosia.* The paragraph is written in normal type, neither large nor bold. In addition, the disclaimer, although set off on its own page, is on the last page of a 70–page employee handbook. That placement does not meet the prominence requirements articulated in *Nicosia.* This error is cured, however, in the 1997 version of the employee handbook, where the same disclaimer is set out on a separate page on the first page of the text of the manual. (Defendant's Exh. C). The language in the 1997 manual, and the placement of the disclaimer, meet the *Falco* standards. For that reason, no employment contract is created and the plaintiff's claims based upon such an alleged contract are dismissed.[2]

### B. Plaintiff's Wrongful Discharge Claim is Duplicative of Her New Jersey LAD Claim and is Dismissed.

In *Catalane v. Gilian Instrument Corp.,* the New Jersey Appellate Division stated that:

> Our Legislature has declared the remedies available under the LAD and would appear to have expressed the view that a common law claim for discrimination is unnecessary as the statute should be read broadly enough to encompass those

---

2. At oral argument the Court and counsel discussed the question of whether the 1992 disclaimer, if ineffective because it was inconspicuous, could be resurrected by the 1997 handbook although the latter was created only after plaintiff commenced employment. Stated otherwise, was the 1997 disclaimer such an alteration of the terms and conditions of plaintiff's employment as to require separate consideration to be enforceable? "The New Jersey courts have not set out rules governing when and if one employee handbook

can supersede another." *Varrallo v. Hammond Incorporated,* 94 F.3d 842, 846 (3d Cir. 1996). This Court predicts, however, that, if confronted with the present circumstances: where the disclaimers are identical and substantively effective, with the only distinction being the prominence of the disclaimer in the handbook, the Supreme Court of New Jersey would find the present disclaimer effective to bar the employment contract claims asserted in the case at bar.

claims and damages previously available at common law....

271 N.J.Super. 476, 492, 638 A.2d 1341 (App.Div.1994). The *Catalan* court found that:

Based on the legislative intent demonstrated by N.J.S.A. § 10:5–3, we conclude that the plaintiff's common law claim that he was terminated because of his age in violation of public policy should not have been submitted to the jury. His right and cause of action were statutory.

(*Id.*) Other New Jersey courts are in accord with this finding. "A common law claim for wrongful termination is not viable insofar as it seeks the same remedy available under the [NJLAD]." *DeJoy v. Comcast Cable Communications, Inc.*, 941 F.Supp. 468, 475 (D.N.J.1996) (*citing Kapossy v. McGraw–Hill, Inc.*, 921 F.Supp. 234, 249 (D.N.J.1996) (*citing Catalane*, 271 N.J.Super. at 491–92, 638 A.2d 1341)); *accord Sturm v. UAL Corp.*, 1998 WL 784615, at \*10 (1998) ("Courts of this district interpreting New Jersey law have also consistently held the NJLAD to preempt duplicative common law discrimination claims.")

■ Plaintiff's wrongful discharge claim does not allege any facts distinct from plaintiff's NJLAD claim. In plaintiff's claim, she merely realleges that: "The above described actions of Defendant's constitute a wrongful discharge entitling Plaintiff to general, compensatory, and punitive damages." (Compl. at 19). Therefore, plaintiff's wrongful discharge claim is dismissed as duplicative of her LAD claim.

### C. Plaintiff's Claim for Intentional Infliction of Emotional Distress is Dismissed.

■ To establish a claim for intentional infliction of emotional distress, a plaintiff is required to establish: (1) that the defendants acted intentionally or recklessly, both in doing the act and in producing emotional distress; (2) that the defendants' conduct was so outrageous in character and extreme in degree as to go beyond all bounds of decency; (3) that the defendants' action were the proximate cause of the emotional distress; and (4) that the emotional distress suffered was so severe that no reasonable person could be expected to endure it. *Buckley v. Trenton Sav. Fund Soc'y*, 111 N.J. 355, 366, 544 A.2d 857 (1988). In addition, "The conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Taylor v. Metzger*, 152 N.J. 490, 509, 706 A.2d 685 (1998) (quoting *Buckley*, 111 N.J. at 366, 544 A.2d 857 (quoting *Restatement (Second) of Torts*, § 46 cmt. d)).

New Jersey law on intentional infliction of emotional distress accepts that employers are subject to liability for actions that would not produce a claim for intentional infliction of emotional distress in others. For example, in *Taylor*, the Supreme Court of New Jersey found that "the power dynamics of the workplace contribute to the extremity and the outrageousness of defendant's conduct." *Taylor*, 152 N.J. at 511, 706 A.2d 685 (*citing* Stuart M. Speiser et al., *4 The American Law of Torts* § 16.21, at 1094 (1987) ("Courts in quite a few states have considered the employer-employee relationship a significant factor in determining whether there is liability for the tort of intentional infliction of emotional distress.")) Holding the defendant in this case to the higher burden applied to employers, this Court still does not find that the plaintiff has articulated a viable claim.

In pleading her claim for emotional distress, Ms. Mardini alleges that the defendants "intended to and did inflict severe emotional distress upon Plaintiff", that "Defendants acted with a reckless disregard of the probability of causing Plaintiff emotional distress, and that as a direct result of the outrageous acts ... Plaintiff became physically distraught and sustained a shock to her nervous system and

suffered severe emotional distress." (Compl. at 20).

The severity of the emotional distress raises questions of both law and fact. Thus, the Court decides whether as a matter of law such emotional distress can be found, and the jury decides whether it has in fact been proven.

■ Ms. Mardini has not alleged that she had to seek medical assistance, or that any specific ailments afflicted her. In *Buckley,* the Court found that the plaintiff's complaints "amounted to nothing more than aggravation, embarrassment, an unspecified number of headaches, and loss of sleep." *Buckley,* 111 N.J. at 368, 544 A.2d 857. In the instant case, the plaintiff has alleged even less severe symptoms of distress than the plaintiff in *Buckley.* Therefore, the plaintiff's claim for intentional infliction of emotional distress fails to meet the requirements of the fourth prong of the *Buckley* analysis. For that reason, this Court need not reach the decision of whether the actions by the defendants were extreme and outrageous. Therefore, plaintiff's claim for intentional infliction of emotional distress is dismissed.

### D. Plaintiff's Cause of Action Alleging Fraud is Dismissed for Lack of Specificity.

■ Federal Rule of Civil Procedure 9(b) provides that when pleading a cause of action for fraud, "the circumstances constituting fraud ... shall be stated with particularity." Plaintiffs need not, however, plead the "date, place or time" of the fraud, as long as they use an "alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644, 658 (3d Cir .1998) (quoting *Seville Indus. Machinery v. Southmost Machinery,* 742 .F.2d 786, 791 (3d Cir.1984)). And, although Rule 9(b) requires heightened specificity, courts should apply the rule with flexibility and "should not require plaintiffs to plead issues that may have been concealed by the defendants." 155 F.3d at 658; *Chris-*

*tidis v. First Pennsylvania Mortg. Trust,* 717 F.2d 96, 99 (3d Cir.1983).

■ In the instant case, under the heading the sixth cause of action, plaintiff makes only conclusory statements, such as "Defendants made material misrepresentations of the fact that plaintiff be judged upon the basis of merit and ability" and "Defendants concealed facts from Plaintiff which Defendant had a duty to disclose to the effect that Defendants would not provide Plaintiff with an opportunity to be evaluated on a nondiscriminatory basis for transfer or promotion." (Compl. at 22). These statements do not meet the required level of specificity articulated in Rule 9(b). There is no indication of who made them, what specific misrepresentations were made, and when these statements occurred. Plaintiff's claims of fraud appear to be based on the employment manual, since her reading of the manual is the only instance she cites where Viking promised that she would be judged fairly. (*Id.* at 15). However, plaintiff cannot base a claim of fraud on an employment manual's representations of future advancement. In order to articulate a cause of action for fraud, a plaintiff must show that the defendant made "a material representation of a presently existing or past fact, ... with knowledge of its falsity and with the intention that the other party rely thereon, resulting in reliance by that party to his detriment." *Nappe v. Anschelewitz, Barr, Ansell & Bonello,* 97 N.J. 37, 477 A.2d 1224 (1984). The employment manual's representations that the plaintiff would be considered on an equal footing with male employees involves a future event, and a claim of fraud cannot be based upon such a representation. Therefore, plaintiff's claim of fraud is dismissed, without prejudice to plaintiff's right, should she choose to do so, to' file and serve an amended complaint, within 15 days, asserting such a claim with the particularity required by Rule 9(b).

### E. The New Jersey Workers' Compensation Act Bars Plaintiff's Negligent Supervision of Employees Claims.

An action in negligence by an employee against an employer in New Jersey is barred by the New Jersey Workers' Compensation Act, N.J.S.A. 34:15–8. *Silvestre v. Bell Atlantic Corp.*, 973 F.Supp. 475, 486 (D.N.J.1997), *aff'd*, 156 F.3d 1225 (3d Cir. 1998) (*citing Fregara v. Jet Aviation Bus. Jets*, 764 F.Supp. 940, 954 n. 8 (D.N.J. 1991)) (dismissing plaintiff's cause of action for "negligent evaluation," and noting that "plaintiff cannot pursue any cause of action based upon negligence due to the exclusive remedy provision set forth in the New Jersey Workers' Compensation Act, N.J.S.A. 34:15–8"); *Wellenheider v. Rader*, 49 N.J. 1, 9, 227 A.2d 329 (1967); *Millison v. E.I. du Pont de Nemours & Co.*, 101 N.J. 161, 165, 501 A.2d 505 (1985) (characterizing N.J.S.A. 34:15–8 as an "exclusive remedy"). Therefore, the plaintiff cannot sustain a claim against her former employer for negligent supervision of employees, and her seventh claim is dismissed.[3]

### CONCLUSION

For the foregoing reasons, defendant's motion to dismiss is granted. Plaintiff's fraud claim is dismissed without prejudice and her claims for breach of an employment contract, breach of a covenant of good faith and fair dealing, wrongful discharge at common law, intentional infliction of emotional distress and negligent supervision are dismissed with prejudice. Plaintiff's New Jersey LAD claim, which was not subject to this motion, remains.

---

3. At oral argument, plaintiff's counsel consented to the dismissal of this claim.